UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MELANIE J. MEDFORD,

        Plaintiff,

v.

NANCY A. BERRYHILL,[1] ACTING
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

6:16-cv-01295-YY

OPINION AND ORDER

YOU, Magistrate Judge:

## INTRODUCTION

Plaintiff, Melanie Medford ("Medford"), seeks judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33. This court has jurisdiction to review the Commissioner's decision

---

[1] The official title of the head of the Social Security Administration is the "Commissioner of Social Security." 42 USC § 902(a)(1). Nancy A. Berryhill, Acting Commissioner of Social Security, is substituted in as a party in this case pursuant to FRCP 25(d).

pursuant to 42 USC § 405(g).  Both Medford and the Commissioner have consented to allow a Magistrate Judge to enter final orders and judgment in this case.  ECF #6; FRCP 73; 28 USC § 636(c).  For the reasons set forth below, the Commissioner's decision is REVERSED and this case is REMANDED for further proceedings.

## ADMINISTRATIVE HISTORY

Medford protectively filed for DIB on December 17, 2012, alleging a disability onset date of November 23, 2012.  Tr. 20, 175-80.[2]  Her application was denied initially on August 9, 2013 (Tr. 77, 91-92), and on reconsideration on September 18, 2013 (Tr. 93, 108-09).  On October 20, 2014, a hearing was held before Administrative Law Judge ("ALJ") Luke Brennan.  Tr. 40-76.  The ALJ issued a decision on January 28, 2015, finding Medford not disabled.  Tr. 20-33.  The Appeals Council denied a request for review on June 8, 2016.  Tr. 1-4.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR § 404.981.

## BACKGROUND

Born in July 1960, Medford was 54 years old at the time of the hearing before the ALJ.  Tr. 45.  Medford is a high school graduate and previously worked as a house cleaner.  However, the ALJ concluded that Medford's past work did not reach the level of "substantial gainful activity," and she therefore had no past relevant work for purposes of her DIB application.  Tr. 31.  Medford alleges she is unable to work due to a history of aneurysmal coiling, anterior communicating artery (brain) aneurysm with intracranial hemorrhage (stroke), hydrocephalus with shunt, hypertension, and depression.  Tr. 22, 94.

---

[2]  Citations are to the page(s) indicated in the official transcript of the record filed on December 7, 2016 (ECF #10).

## MEDICAL BACKGROUND

On November 23, 2012, Medford was admitted to an emergency room with left leg weakness, was observed to have facial droop, and was diagnosed with an intracranial hemorrhage. Tr. 294-95. Ten years earlier, Medford underwent aneurysmal coiling treatment for a brain aneurysm, which eventually developed a hydrocephalus that required a right parietal shunt. Tr. 294-95, 322. Treating physician Bruce J. Andersen, M.D., felt the hemorrhage was due to Medford's hypertension, and she was discharged after two days. Tr. 294.

Medford was again admitted to the emergency room less than two weeks later, on December 4, 2012, experiencing disorientation and significant weakness in her left leg. Tr. 302. She was diagnosed with an anterior communicating artery aneurysm, hydrocephalus with shunt placement, hypertension, anxiety, and depression. *Id*. Medford was advised not to drive or return to work, and the attending physician's assistant felt she might require 24-hour supervision when released from the hospital. Tr. 464. After three days in the hospital, Medford was transitioned into acute inpatient rehabilitation. Tr. 459, 461.

After showing improvement in self-care and mobility over the next two weeks, she was discharged to her home on December 20, 2012. Tr. 457-58. She was advised to attend occupational therapy, physical therapy, speech therapy, and neuropsychological therapy. Tr. 457.

Jason D. Gage, Ph.D., performed a neuropsychological assessment on January 15, 2013. Tr. 384-85. Medford's memory was improving, though still impaired, and she continued to have difficulty concentrating, organizing, planning, and multitasking. Tr. 384. Dr. Gage diagnosed a cognitive disorder secondary to thalamic bleed, and found Medford to

have a lot of difficulty with attention and concentration, as well as processing speed. Tr. 384. She scored in the "borderline range at the 5th percentile" for both attention and processing speed. Tr. 385.

Two months later, on March 11, 2013, Medford was again admitted to the hospital because she could not open her left hand and had general weakness throughout the left side of her body. Tr. 535, 540. Mary E. River, M.D., evaluated Medford, and indicated it was unclear if she had suffered another seizure/stroke event or if her symptoms were the result of her prior aneurysm. Tr. 533. By the next day, Medford reported feeling that she was "back to her baseline." Tr. 520. Following an MRI, she was diagnosed with "acute ischemic stroke," prescribed Plavix, and discharged on March 13, 2013. Tr. 512.

Rodde Cox, M.D., examined Medford on March 18, 2013. Tr. 456. Dr. Cox felt Medford had suffered a recurrent stroke the week before, and noted continuing symptoms in her left arm and right leg. *Id*. At a follow-up appointment on April 8, 2013, Dr. Gage noted "significant improvement with regard to processing speed." Tr. 476. Although Medford still showed "significant deficits regarding visuospatial skills and attention," she was doing well enough to attempt a driving test. *Id*. The following month, Dr. Cox noted that Medford was driving again and was doing "reasonably well." Tr. 566. Dr. Cox observed continuing "discoordination" in Medford's left upper extremity, gave Medford some exercises, and encouraged her to begin using her hand more for "fine motor hobbies such as jigsaw puzzles." *Id*. Also in May 2013, Medford's speech pathologist indicated that Medford had met all of her long-term treatment goals and she was therefore discharged. Tr. 592.

In July 2013, Dr. Gage noted that Medford was "driving during the day . . . without any problems." Tr. 570. Although she had made improvements in some areas, she continued to have difficulty with visual attention and memory. *Id*. Dr. Gage explained that Medford should be able to resume nighttime driving once she had shown some mild improvement in visuospatial skills. *Id*.

On July 27, 2013, Ralph D. Heckard, M.D., performed a consultative neurological examination. Tr. 620-23. At that exam, Medford displayed "[e]vident memory and executive function impairments" and "asymmetrical sustained dyscoordination of dexterity." Tr. 621. Although Medford had mild left-sided weakness, she had normal range of motion and strength, and no other deficits of motor, sensory, or reflex functions of any extremity. Tr. 623. With regard to her mental condition, Dr. Heckard concluded that Medford presented with "mental status features which could significantly impair her ability to make reasonable workplace decisions and occupational adjustments," was "easily confused at time," and displayed "alterations of affect and cognition." *Id*.

At a follow-up appointment in mid-August 2013, Dr. River noted a slight loss of motor strength on the left side and that Medford had one more week of Plavix before switching to aspirin once daily. Tr. 626-27. The doctor noted that Medford asked her to complete some disability paperwork, stating, "this may or may not get her disability, [s]he may need to undergo neuropsychological testing . . . [,] actual physical and neurologic difficulties are not profound." Tr. 627.

Within a day of the initial and reconsideration denials of Medford's application, two state agency doctors reviewed Medford's record, including Martin Seidenfield, Ph.D. (Tr. 87-90, Aug. 9, 2013) (followed by initial denial the same day) and Mack Stephenson, Ph.D. (Tr.

5 – OPINION AND ORDER

104-07, Sept. 17, 2013) (followed by reconsideration denial the following day). Dr. Seidenfield found Medford to have "some confusion and difficulty with stress," as well as moderate limitations in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; and (4) respond appropriately to changes in the work setting. Tr. 88-89. Dr. Stephenson found these same limitations. Tr. 105-06. With regard to the paragraph B criteria, the opinions of Drs. Seidenfeld and Stephenson differ: Dr. Seidenfeld assessed moderate limitations in both ADLs and social functioning, while Dr. Stephenson assessed merely mild limitations in ADLs and moderate limitation in social functioning. Tr. 83-84, 100. However, in the separate section for assessing Medford's mental RFC, Drs. Seidenfeld and Stephenson both declined to assess any social limitations. Tr. 89, 106.

Medford had another follow-up appointment with Dr. River on January 22, 2014. Tr. 706-07. At that appointment, Medford reported an abrupt onset of bilateral hand numbness, which Dr. River found "concerning for paraneoplastic neuropathy." Tr. 706. Dr. River ordered a nerve conduction study, to look for peripheral neuropathy, followed by an MRI of the cervical spine to rule out spinal stenosis if the nerve conduction study proved negative. Tr. 707.

On February 27, 2014, Medford again saw Dr. River, who noted that the nerve conduction study was normal in both the upper and lower extremities. Tr. 711. Dr. River opined that Medford's reported neuropathy might be musculoskeletal rather than neurological, and suggested Medford wear an elbow sleeve. *Id*.

A month later, on March 20, 2014, Dr. Andersen reviewed a catheter angiogram of Medford's aneurysm site, which revealed no unprotected aneurysmal wall. Tr. 704. He

indicated he would continue the annual surveillance of the issue as scheduled in a few months. *Id.*

On May 7, 2014, at a follow-up appointment with Dr. River, Medford reported no new complaints and that her peripheral numbness had improved with avoidance of prolonged positioning and the use of elbow sleeves. Tr. 701. She was advised to follow-up again in six months.

## **DISABILITY ANALYSIS**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. 20 CFR § 404.1520(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); *Tackett*, 180 F.3d at 1099.

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(v) & (g).

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Medford did not engage in substantial gainful activity from November 23, 2012, the alleged onset date of disability, through September 30, 2014, her date last insured. Tr. 22.

At step two, the ALJ determined that Medford has the following severe impairments: right basal ganglia stroke, history of aneurysmal coiling with intracranial hemorrhage,

depression, and hypertension. *Id.* He further found the non-severe impairments of history of alcohol abuse and "back problems." Tr. 23.

At step three, the ALJ concluded that Medford does not have an impairment or combination of impairments that meets or equals any listed impairment. *Id.* The ALJ found that Medford has the RFC to perform light work with the following additional limitations: "The claimant can sit for a total of six hours during an eight-hour day, and can stand and/or walk for up to six hours out of an eight-hour day . . . can occasionally operate foot controls with the left lower-extremity and frequently reach overhead with the left upper-extremity . . . has unlimited ability to reach with the right upper-extremity . . . can frequently climb ramps and stairs, ladders, and scaffolds . . . can frequently balance and stoop . . . can have occasional exposure to unprotected heights and moving mechanical parts . . . can perform simple routine tasks and can make simple work-related decisions." Tr. 26.

The ALJ determined at step four that Medford had no past relevant work. Tr. 31.

At step five, the ALJ found that considering Medford's age, education, and RFC, she was capable of performing the occupations of fruit cutter, photocopy machine operator, and usher. Tr. 33. Accordingly, the ALJ determined that Medford was not disabled at any time from November 23, 2012, through September 30, 2014, her date last insured. *Id.*

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir. 2007) (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir.

1998)). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1205 (9th Cir. 2008) (citing *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004)); *see also Lingenfelter*, 504 F.3d at 1035.

## DISCUSSION

Medford challenges the ALJ's RFC formulation, which she alleges (1) failed to include functional impairments set forth in the medical opinion evidence; and (2) resulted in erroneous findings at step five.

### I. Medical Opinion Evidence

Medford assigns error to the ALJ's assessment of several medical opinions, including those of an examining physician, two non-examining physicians, and one by a certified nurse practitioner ("CNP").

**A. Legal Standard**

"The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities." *Vazquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted); *see also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). The Ninth Circuit distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. The opinions of treating physicians are generally accorded greater weight than the opinions of non-treating

physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If, however, a treating physician's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating physician's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities. *Tommasetti*, 533 F.3d at 1040-41.

**B. Whether the RFC Adequately Addresses Claimant's Mental Impairments**

The crux of this case is whether the RFC compiled by the ALJ, finding that Medford "can perform simple routine tasks and can make simple work-related decisions," adequately captures the opinion evidence of four medical providers regarding Medford's non-exertional impairments, including the opinions of a state agency consultative examiner, two state agency non-examining (reviewing) doctors, and Medford's treating certified nurse practitioner ("CNP").

The ALJ noted that Medford's "hypertension and right-sided basal ganglia strokes have caused more than minimal limitations to [her] physical and mental ability to perform work related activities." Tr. 28. With little explanation, the decision purports to take Medford's "cognitive limitations into consideration [by limiting Medford] to simple, routine tasks and simple work-related decisions." Tr. 31. However, after carefully reviewing the record, this court concludes that the ALJ erred by failing to properly account for medical opinion evidence, and that remand for further proceedings is therefore necessary to allow step five proceedings based on an appropriate RFC.

### 1. Consultative Medical Examiner Ralph Heckard, M.D.

Dr. Heckard performed a consultative examination of Medford in July 2013, and provided medical opinions regarding her physical and mental functional abilities. Tr. 620-23. Dr. Heckard noted that Medford was "easily confused at times," displayed "alterations of affect and cognition," as well as "[e]vident memory and executive function impairments," and had "presenting mental status features which could significantly impair her ability to make reasonable workplace decisions and occupational adjustments." Tr. 621, 623. The ALJ purported to accord Dr. Heckard's opinions "great weight" (Tr. 29) and gives no reason to discount those opinions. However, nowhere does the ALJ explain how limiting Medford to performing "simple, routine tasks" and making "simple work-related decisions" captures a significant impairment to Medford's ability to make reasonable workplace decisions without regard to the complexity or simplicity of those decisions, nor does the ALJ explain how the RFC captures a significant impairment to Medford's ability to make occupational adjustments.

The Commissioner argues that the ALJ adopted the finding of reviewing Drs. Seidenfeld and Stephenson that Medford had no significant limitation on her "ability to make simple work-related decisions" and "persist in simple/routine tasks" (Tr. 89, 105-06), and faults Medford for failing to "identify any reason why the ALJ's and the State agency psychological consultants' interpretations of the evidence were irrational." Defendant's Brief (ECF #14), p. 6. This argument skirts two fundamental problems. First, the Commissioner gave no reason at all to reject Dr. Heckard's opinion, much less the specific, legitimate reasons required for rejecting it. This lack of explanation contrasts starkly with the ALJ's purported decision to give Dr. Heckard's opinion "great weight," and giving only "little" or "partial" weight to the opinions of the reviewing doctors, on whose opinions the Commissioner now so heavily relies. Tr. 29-30.

Second, the limitation expressed in the RFC does not adequately capture Dr. Heckard's opinion, resulting in a flawed step five analysis. *See Embrey*, 849 F.2d at 422. This court agrees with Medford that this error is not harmless for a multitude of reasons, requiring remand for further proceedings based on an adequate RFC. *See* Plaintiff's Social Security Brief (ECF #11), pp. 8-10.

## 2. Reviewing Agency Psychological Consultants

Medford also argues the ALJ erred in failing to properly reject portions of the opinions of the state agency examiners, Martin Seidenfield, Ph.D. (Tr. 87-90, Aug. 9, 2013), and Mack Stephenson, Ph.D. (Tr. 104-07, Sept. 17, 2013). This court will address only the most glaring error, which again requires remand for further proceedings.

The ALJ repeatedly references medical evidence regarding Medford's moderate difficulties in concentration, persistence, and pace, including explicit findings on that limitation by Drs. Seidenfield and Stephenson. Tr. 25-27, 29-31. However, as noted by Medford, the ALJ does not otherwise address these limitations in his decision. The Commissioner gives two reasons why this omission is of no moment, neither of which withstand scrutiny. First, the Commissioner argues that, by limiting Medford to "simple routine tasks" and "simple work-related decisions," the ALJ encapsulated Medford's difficulties in concentration, persistence, and pace. However, the ALJ accepted and cited multiple restrictions identified in the medical testimony that bear on concentration, persistence or pace, but are not accounted for in restrictions to "simple routine tasks" and "simple work-related decisions." Tr. 25, 27. Second, the Commissioner contends that the ALJ cited specific evidence in the record to support his finding. However, the only citations the Commissioner gives in support of that argument are with regard to evidence about Medford's social activities. That evidence does not address Medford's

difficulties with concentration, persistence, or pace, and consequently provides no legitimate basis for failing to incorporate that limitation into the RFC.

### 3. Treating Nurse Practitioner Gloria Beery, CNP, MS

Finally, Medford alleges the ALJ failed to properly evaluate the opinion provided by treating nurse practitioner Gloria Beery, CNP, MS. As a certified nurse practitioner, CNP Beery is a medical source, but is not considered an "acceptable medical source" under the Act; accordingly, the applicable legal standard is the equivalent of a lay witness, or "other source." *Dale v. Colvin*, 823 F.3d 941, 943 (9th Cir. 2016); SSR 06-03P, 2006 WL 2329939 at *3 (Aug. 9, 2006). Lay witness testimony regarding the severity of a claimant's symptoms or how an impairment affects a claimant's ability to work is competent evidence that an ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). In order to reject such testimony, an ALJ must provide "reasons germane to each witness." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citations omitted). "Further, the reasons 'germane to each witness' must be specific." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (citing *Stout*, 454 F.3d at 1053).

In an August 21, 2014 assessment, CNP Beery indicated that Medford had a wide range of physical impairments, which the ALJ summarized. Tr. 30, 713-15. The ALJ accorded little weight to the opinion, noting that some of the limitations found by CNP Beery were inconsistent with Medford's appraisal of her own abilities, were internally inconsistent, and that she "simply checked boxes on a form. Tr. 30. However, the ALJ did not comment at all on the limitations CNP Beery listed regarding mental impairments. For example, CNP Beery wrote, "I believe her mental function warrants the disability primarily – slowed speech and perception," and indicated Medford's "organizational and focus skills compromise function," referencing her assessed

postural limitations. Tr. 713. CNP Beery further opined that Medford would miss more than four days of work per month due to her impairments. Tr. 714. Medford contends it was reversible error for the ALJ to omit any discussion of the effect of her mental impairments on the functional limitations set forth by CNP Beery.

Medford submits that two of the ALJ's stated rationales for rejecting CNP Beery's opinion pertained strictly to physical impairment, and therefore does not challenge them; Medford instead focuses on the two remaining rationales, namely that the form was a check-the-box format, and that the opinion was inconsistent with the record. The Commissioner argues that all of the reasons set forth by the ALJ for rejecting CNP Beery's opinion apply both to her opinion regarding Medford's physical and mental impairments.

In support of the position that the ALJ's rationales apply equally to the mental impairments noted by CNP Beery, the Commissioner argues that this case is distinguishable from *Dale*, in which the Ninth Circuit determined that "an ALJ errs when he discounts another source's *entire* testimony because of inconsistency with evidence in the record, when the ALJ has divided the testimony into distinct parts and determined that only one part of the testimony is inconsistent." *Dale*, 823 F.3d at 945 (emphasis in original). The Commissioner argues that unlike *Dale*, the ALJ in the instant case did not divide CNP Beery's testimony into parts, and did not erroneously find that some parts were inconsistent. Rather, argues the Commissioner, the rationales cited by the ALJ apply equally to the portions of CNP Beery's testimony that were not mentioned. Defendant's Brief (ECF #14), pp. 13-14. For example, the Commissioner asserts that CNP Beery's opinion that Medford was disabled was not consistent with the record as a whole, because her other treating physicians noted only mild to moderate cognitive deficits. Tr. 31.

However, reviewing the record as a whole, most of the treating and examining medical sources observed symptoms consistent with CNP Beery's written testimony. Dr. Heckard noted Medford was "easily confused at times," and felt her "memory and executive function impairments" would hamper her ability to function in the workplace. Tr. 623. These observations are consistent with CNP Beery's observations of slowed speech and perception, and compromised function. Tr. 713. Also consistent with CNP Beery's notes are Dr. Gage's neuropsychological tests that showed improvement, but still low scores in visual attention and memory. Tr. 570. While Dr. Gage eventually cleared Medford to drive, he instructed her to refrain from night driving if it could be avoided, and encouraged her to "monitor fatigue and attention breakdowns carefully." *Id.* Thus, although the Commissioner maintains that Medford's ability to drive is highly suggestive of increased functional ability, Dr. Gage's notes nevertheless reflect that Medford continued to have "breakdowns" in her functioning, consistent with CNP Beery's testimony. Moreover, although the ALJ was not required to adopt explicitly the findings of the state agency reviewing psychologists, they both noted moderate limitations in concentration, persistence, or pace and dealing with changes in the work setting, also consistent with CNP Beery. Tr. 88-89, 105-06.

Although the Ninth Circuit in *Dale* did not decide whether it was error for an ALJ to reject all of the testimony provided by a nurse practitioner when only part of the testimony was inconsistent when the ALJ did not "divide" the testimony, it noted the possibility. *Dale*, 823 F.3d at 945 n.3. Indeed, at least one other court in the District of Oregon found that it was error for an ALJ to reject the entirety of an "other source" opinion when only a portion of it was inconsistent with the record. *See Despinis v. Comm'r, Soc. Sec. Admin.*, No. 2:16-cv-01373-HZ, 2017 WL 1927926, at *9 (D. Or. May 10, 2017) (ALJ erred by not providing any reason to reject

portion of opinion discussing headaches, where disabling headaches was the plaintiff's primary symptom allegation). Here, although CNP Beery did not divide her testimony into stand-alone parts, it is divided nonetheless: the form she completed was intended to rate physical impairments, but she used the form to provide opinions regarding both physical and mental impairments by writing in the margins and explicitly referencing mental limitations. *See* Tr. 713-14. Further, the ALJ implicitly divided CNP Beery's testimony into parts by commenting and rejecting only the portions regarding physical impairments. *See* Tr. 30-31. As such, the reasoning in *Dale* applies in Medford's favor: because the ALJ divided the "other source" opinion into two parts, the ALJ erred by failing to provide any reason—let alone a germane reason—to discount CNP Beery's testimony as to Medford's mental impairments arising from strokes and brain hemorrhages. *Dale*, 823 F.3d at 945.

Moreover, although nurse practitioners are not "acceptable medical sources" under the regulations,[3] even non-acceptable medical sources may warrant significant weight: "[d]epending on the particular facts in a case . . . an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source.'"[4] SSR 06-03P, 2006 WL 2329939 at *5 (Aug. 9, 2006). As such, simply omitting without comment a nurse practitioner's testimony regarding Medford's allegedly disabling mental impairment was contrary to the Social Security Administration's own rules. As one of Medford's treating

---

[3] As of March 27, 2017, certain advanced-practice registered nurses, including nurse practitioners, are now deemed "acceptable medical sources." 20 CFR § 404.1502(7-8). However, the regulatory change applies only to disability applications filed after the effective date. *Id.*

[4] Factors to consider if according more weight to a non-acceptable medical source include: length of treatment and frequency of contact; consistency with the medical evidence; evidentiary support and quality of the opinion; specialty area knowledge; and other factors. SSR 06-03p at *4-5.

17 – OPINION AND ORDER

providers, CNP Beery was in a unique position to observe Medford's symptoms over time; as a nurse practitioner, her assessment of Medford's level of impairment is all the more potentially probative. The ALJ was required to identify specific reasons for rejecting lay testimony beyond a boilerplate assertion that it was not consistent with the medical record. *Bruce*, 557 F.3d at 1116.

The Commissioner argues the court should affirm the ALJ's treatment of CNP Beery's testimony regarding mental impairments because her opinion was: (1) conclusory and reserved to the Commissioner; (2) *consistent* with other evidence of record; and (3) qualified by CNP Beery's notation that Dr. Rivers was better able to "assess details," and Dr. Rivers indicated she was unsure if Medford would qualify for disability. However, these arguments all constitute *post-hoc* rationales the ALJ did not invoke in rejecting the relevant portion of CNP Beery's testimony; as such, those rationales cannot be grounds upon which to affirm the ALJ's decision. *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (citations omitted). Accordingly, because CNP Beery's testimony regarding Medford's mental limitations was rejected without comment, and because the testimony potentially impacts the non-disability decision, the ALJ erred.

## II. RFC Formulation

The RFC is the most a claimant can do, despite their physical and mental impairments. 20 CFR § 404.1545. In formulating an RFC, the ALJ must consider all medically determinable impairments, including those that are not "severe," in conjunction with an analysis of all the relevant medical evidence, and any testimonial evidence. *Id.*; SSR 96-8p, 1996 WL 374184 (July 2, 1996). As discussed above, the ALJ erred in evaluating the medical testimony regarding Medford's non-exertional impairments. Accordingly, the RFC cannot be said to be based on substantial evidence. Assuming for the sake of argument CNP Beery's testimony was

accurate, Medford would presumably miss more than four days per month, have difficulty hearing and speaking, and demonstrate slowed speech and perception. Tr. 713-14. By ignoring CNP Beery's testimony, as well as the limitations endorsed by the other medical opinions discussed above, the ALJ's RFC, and the ALJ's subsequent step five analysis is flawed. *See Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

## III. Remand

When a court determines the Commissioner's ultimate disability decision includes legal error and/or is unsupported by substantial evidence, the court may affirm, modify, or reverse the decision by the Commissioner "with or without remanding the case for a rehearing." 42 USC § 405(g); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). Here, the ALJ's failure to adequately account for Medford's non-exertional impairments in the RFC requires remand. This court concludes that further proceedings are needed to properly evaluate the medical testimony in light of the record as a whole.

## **ORDER**

For the reasons discussed above, the Commissioner's decision is REVERSED and REMANDED for further proceedings pursuant to sentence four of 42 USC § 405(g).

DATED November 8, 2017.

                                                  /s/Youlee Yim Yim
                                                  Youlee Yim You
                                                  United States Magistrate Judge